*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | Supreme Court No. S-18354 |
| Petitioner, | ) | Court of Appeals No. A-13074 |
| | ) | |
| v. | ) | Superior Court No. 3AN-14-09600 CR |
| | ) | |
| BRENNAN GRUBB, | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | No. 7693 – April 12, 2024 |
| | ) | |

Petition for Hearing from the Court of Appeals of the State of Alaska, on appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Donald Soderstrom, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Petitioner. Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Respondent.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.

## I. INTRODUCTION

Brennan Grubb sexually abused a young boy. The boy suffered severe emotional trauma as a result of the abuse, and the boy's mother resigned from her job as a teacher to take care of her son.

Grubb pled guilty to sexual abuse of a minor. At sentencing the superior court ordered Grubb to pay restitution, including compensation to the mother for future lost wages and benefits that she would have earned as a teacher. Grubb appealed the restitution order, arguing that his criminal conduct was not the proximate cause of the mother's future lost wages and benefits. The court of appeals agreed with Grubb and vacated the restitution order.

We granted the State's petition for hearing. We now reverse the decision by the court of appeals because we conclude that the mother's resignation from her teaching position was a reasonably foreseeable consequence of Grubb's criminal conduct. We remand to the court of appeals for further proceedings consistent with this opinion.

## II. FACTS AND PROCEEDINGS

### A. Proceedings In The Superior Court

#### 1. Change of plea, sentencing, and proposed restitution amounts

The State charged Grubb with five counts of sexual abuse of a minor in the first degree[1] for his abuse of nine-year-old M.M.[2] At the time of the offenses Grubb was sixteen years old and was automatically charged as an adult pursuant to AS 47.12.030. As part of an agreement Grubb pled guilty to an amended charge of sexual abuse of a minor in the second degree[3] and admitted to the conduct alleged in

---

[1]     AS 11.41.434(a)(1) (providing that "[a]n offender commits the crime of sexual abuse of a minor in the first degree if . . . being 16 years of age or older, the offender engages in sexual penetration with a person who is under 13 years of age or aids, induces, causes, or encourages a person who is under 13 years of age to engage in sexual penetration with another person").

[2]     This opinion uses initials to protect the victims' privacy.

[3]     AS 11.41.436(a)(2) (providing that "[a]n offender commits the crime of sexual abuse of a minor in the second degree if, . . . being 16 years of age or older, the offender engages in sexual contact with a person who is under 13 years of age or aids,

the original complaint. Grubb also agreed to pay restitution in an amount to be determined by the court.

At sentencing the superior court found that two aggravating factors were present: (1) Grubb's conduct was within the most serious included in the definition of the offense,[4] and (2) Grubb knew or reasonably should have known that M.M. was a particularly vulnerable victim.[5] The court imposed a sentence of 30 years with 20 years suspended, leaving 10 years to serve. The court also placed Grubb on probation for 10 years.

The State initially proposed a restitution judgment in the amount of $20,700.35. This proposed judgment included costs for a home security system, as well as M.M.'s past and future counseling costs. The proposed judgment also included $9,003.31 to the Alaska Violent Crimes Compensation Board (VCCB)[6] to reimburse it for payments it had made to M.M.'s mother, T.R., for her past lost wages.

Grubb filed a partial objection to the proposed restitution judgment and requested an evidentiary hearing. Prior to the hearing, the State filed notice of an amended proposed restitution judgment in the amount of $216,307.55. The bulk of the additional restitution sought was $52,144.00 for T.R.'s future lost wages and $144,894.00 for her future lost retirement benefits. The proposed judgment was supported by a document that outlined how T.R. had calculated her future lost wages and benefits.

---

induces, causes, or encourages a person under 13 years of age to engage in sexual contact with another person").

[4]     AS 12.55.155(c)(10).

[5]     AS 12.55.155(c)(5).

[6]     The VCCB is authorized to provide compensation for losses to crime victims. *See* AS 18.67.110.

Grubb objected to the amended proposed restitution judgment and again requested an evidentiary hearing.

## 2. Restitution hearings

The superior court held three evidentiary hearings on restitution. M.M.'s therapist testified that M.M. had been diagnosed with post-traumatic stress disorder (PTSD) and had difficulty feeling safe following the abuse.

T.R. testified to the impact that Grubb's abuse of M.M. had on both her and her son. T.R. had been employed as a middle school teacher for 16 years, from 1999 to 2015. T.R. explained that she had intended to work as a teacher for a minimum of 20 years because, at the time she was hired, a teacher could retire after 20 years of service and collect retirement benefits equal to 40% of their base salary from their top three highest-earning years.[7] If T.R. worked as a teacher for 25 years, she would also get health benefits and a higher percentage of her base salary upon retirement.[8]

T.R. testified that she obtained her real estate license in 2012 or 2013 and had been working as a realtor during evenings, weekends, and summers prior to her resignation from the school district. She had planned to work as a full-time realtor after retirement from the school district.

T.R. testified that M.M. first told her about Grubb's abuse in September 2014, at the beginning of her sixteenth year of teaching. T.R. explained that M.M. struggled emotionally and needed a lot of support during the 2014 fall semester. T.R. reported that it was difficult to get M.M. to go to school and that it was difficult to go to work herself. M.M. would call her in various stages of distress, sometimes multiple times during a school day. Prior to Grubb's abuse, M.M. did not need this level of support and had never called her at work for emotional support. In addition to being

---

[7]     *See* AS 14.25.110.

[8]     *See* AS 14.25.168(d)(1)-(2).

diagnosed with PTSD following the abuse, M.M. experienced suicidal thoughts and a great deal of anxiety and fear.

Although T.R. continued teaching for a period of time, she faced serious challenges. Immediately after learning of the abuse, T.R. asked her supervisor to allow her to drop her first period class to care for M.M. in the mornings. The supervisor granted the request, but T.R.'s pay was cut by 20%.

At the end of the 2014 fall semester, T.R.'s supervisor advised her that she would be required to return to a full class schedule during the upcoming semester. T.R. attempted to negotiate a flexible work schedule that would allow her to meet M.M.'s daily needs. Despite her best efforts, T.R.'s work schedule was not flexible enough and by late January 2015 T.R. had been reprimanded for being late to work.

Under the circumstances, T.R. testified that she felt she had three options: (1) continue teaching, (2) take a leave of absence, or (3) resign. Given that her teaching schedule did not allow her the time she needed to meet M.M.'s high needs for care, T.R. decided that she could not continue teaching. Under school policy, if T.R. took a leave of absence, she would not be able to work during her time off, including as a realtor, and could be called back to teach at any time. For these reasons, T.R. testified that taking a leave of absence was an "impossible option" for her. T.R. ultimately resigned from teaching in the spring of 2015. She testified that Grubb was "100% responsible" for her resignation.

T.R. described how M.M.'s high needs persisted even after she resigned from teaching, stating that her "schedule revolved around when he needed to see [her]." She brought M.M. to school, spent a lot of time in his classroom, had lunch with him, and answered his calls. T.R. applied to return to the school district as a teacher in spring 2017 but received no interviews.

T.R. explained how she had calculated her future lost wages and benefits. T.R. resigned at the end of her sixteenth year of teaching; therefore, she needed to work

at least four more years with the school district or wait until she reached the statutory retirement age to collect her retirement benefits. Under the circumstances, if T.R. were rehired by the school district, she would receive a salary equivalent to a teacher with five years' work credit, rather than the sixteen years she had actually worked. In other words, if T.R. had returned to her teaching job, her salary would have been lower than what she was earning prior to her resignation.

School district retirement benefits are calculated using the top three years of base salary.[9] T.R.'s top three earning years, had she not resigned, would have been her eighteenth, nineteenth, and twentieth years. The higher base salary of those upcoming years would have increased the retirement benefits she would have received. T.R. calculated what her salary would have been for the upcoming four years, including a two and a half percent annual salary increase.

In total, T.R. expected to lose at least $52,144.00 in future wages because of her resignation. If T.R. had not resigned, she could have started collecting retirement benefits when she was 42. Based on her understanding that the average life expectancy of a woman in Alaska is 80, T.R. calculated that she would lose $144,894.00 in retirement benefits over her lifetime.

After the restitution hearing Grubb argued that his criminal conduct was not the proximate cause of T.R.'s future lost wages and benefits, contending that there was an "insufficient nexus" between the harm to M.M. and T.R.'s decision to resign. Specifically, Grubb suggested that the reason T.R. resigned was unclear and could have been motivated by her desire to shift to realtor work.

---

[9] *See* AS 14.25.110.

### 3. Restitution order

After the hearings concluded, the superior court issued a written order for Grubb to pay a total of $216,307.55 in restitution.[10] In doing so the court observed that the restitution statute is "fairly broad" and found that the claim for restitution was supported by a preponderance of the evidence.

The court explained that T.R. testified, under oath and subject to cross-examination, that "she was unable to continue in her teaching position" because of M.M.'s frequent breakdowns at school "due to the lingering effects of the abuse that he had suffered at the hands of the defendant." The court quoted T.R.'s testimony, "I can say with one hundred percent certainty that I left teaching because of Mr. Grubb's actions." The court further found T.R.'s "testimony and calculations were credible, accurate, and thorough."

### B. Proceedings In The Court Of Appeals

On appeal Grubb challenged only the portion of the restitution judgment awarding future lost wages and benefits to T.R.[11] He made four primary arguments: the losses were "too speculative to be compensable"; the trial court failed to evaluate whether Grubb's criminal conduct was the proximate cause of the losses; the trial court failed to consider whether the award "should be offset by the mitigating effect of T.R.'s real estate earnings"; and, if T.R.'s future lost wages and benefits are a valid basis for a restitution order, that "this portion of the restitution judgment violate[d] the prohibition on excessive fines in the United States and Alaska Constitutions."[12]

In addressing Grubb's first two arguments, the court of appeals framed the question presented as "whether a defendant can fairly be held liable for wages lost as a

---

[10]   This amount included $207,304.24 to T.R. and $9,003.31 to the VCCB.

[11]   *Grubb v. State*, 506 P.3d 791, 792 (Alaska App. 2022).

[12]   *Id.* at 794.

result of an individual's decision to resign from work to care for a family member."[13] The court of appeals stated that under Alaska law T.R.'s future lost wages and benefits would not be recoverable in a civil suit.[14] It also reasoned that restitution is not intended to allow for greater recovery in a criminal case than a victim would otherwise be entitled to recover under civil tort law.[15]

Based on these understandings the court of appeals concluded that it was required to vacate the portion of the restitution judgment awarding future lost wages and benefits.[16] Because the court found that the losses were not compensable, it did not address Grubb's excessive-fines or duty-to-mitigate arguments.[17]

We granted the State's petition for hearing and ordered full briefing.[18]

## III. STANDARD OF REVIEW

A restitution award is reviewed for an abuse of discretion.[19] "We apply the clearly erroneous standard of review to a trial court's findings of fact. A finding of fact is clearly erroneous and will be reversed only if review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[20]

When a defendant challenges "the sufficiency of the evidence as to restitution," the reviewing court does not make findings as to "issues of credibility,

---

[13] *Id.* at 798.

[14] *Id*. at 792.

[15] *Id*.

[16] *Id.*

[17] *Id.* at 799.

[18] *State v. Grubb*, No. S-18354 (Alaska Supreme Court Order, Aug. 16, 2022).

[19] *Reece v. State*, 881 P.2d 1135, 1138 (Alaska App. 1994) (reviewing restitution order for abuse of discretion).

[20] *State v. Murtagh*, 169 P.3d 602, 606 (Alaska 2007) (citation omitted).

- 8 -     **7693**

which remain within the sole province of the sentencing court."[21] Instead, the reviewing court "construe[s] the record in the light most favorable to the state and determine[s] whether a reasonable fact-finder could conclude that the disputed amount of restitution was established by a preponderance of the evidence."[22]

"We use our independent judgment to review matters of constitutional or statutory interpretation."[23]

## IV. DISCUSSION

The amount of restitution to be paid is determined by "the actual damages or loss suffered by the victim or other injured person,"[24] as proven by a preponderance of the evidence.[25] The restitution amount must be determined in light of both the "public policy that favors requiring criminals to compensate for damages and injury to their victims" and the "financial burden placed on the victim . . . and other persons injured by the offense as a result of the criminal conduct of the defendant."[26] A

---

[21] *Noffsinger v. State*, 850 P.2d 647, 650 (Alaska App. 1993).

[22] *Id*.

[23] *State v. Planned Parenthood of the Great N.W.*, 436 P.3d 984, 991 (Alaska 2019) (citing *Premera Blue Cross v. State, Dep't of Com., Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007)).

[24] *Welsh v. State*, 314 P.3d 566, 567 (Alaska App. 2013); *see, e.g.*, *Reece v. State*, 881 P.2d 1135, 1138 (Alaska App. 1994) (approving restitution order for moving costs and future counseling expenses).

[25] AS 12.55.025(i). Notably, however, the amount of damages "need only be proven to such a degree as to allow the finder of fact to 'reasonably estimate the amount.'" *Pluid v. B.K.*, 948 P.2d 981, 984 (Alaska 1997) (quoting *Blumenshine v. Baptiste*, 869 P.2d 470, 473 (Alaska 1994)).

[26] Former AS 12.55.045(a) (2014). This language reflects the statute at the time of Grubb's offense in 2014. In 2015 the legislature amended this statute to explicitly include "loss of income" as a compensable category. *See* ch. 17, § 1, SLA 2015; *see also Grubb v. State*, 506 P.3d 791, 796 n.19 (Alaska App. 2022) (explaining this change).

restitution order functions both as part of the defendant's sentence and as an enforceable civil judgment.[27]

As the United States Supreme Court has observed, "[i]n a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond."[28] But courts have long recognized that imposing liability on this basis alone would "set society on edge, and fill the courts with endless litigation."[29] Awards of restitution in a criminal case therefore require a showing of proximate cause.[30] This requirement serves to "cut[] off remote chains of causation" that may otherwise generate unchecked liability,[31] excluding "some of the improbable or remote causal connections that would satisfy a pure but-for cause standard."[32]

The inquiry is often phrased as a question of whether an injury is "foreseeable,"[33] or whether it falls within the "scope of the risk" created by a

---

[27] AS 12.55.045(i); *id.* at 12.55.045(l).

[28] *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 n.10 (1992) (quoting W. Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS § 41, 264 (5th ed. 1984)).

[29] *North v. Johnson*, 59 N.W. 1012, 1012 (Minn. 1894).

[30] *Peterson v. Municipality of Anchorage*, 500 P.3d 314, 321 (Alaska App. 2021) ("Alaska employs a test of proximate causation in evaluating claims for restitution in a criminal case"); *see Ned v. State*, 119 P.3d 438, 446 (Alaska App. 2005) (rejecting "but for" causation as basis for restitution and requiring proximate cause).

[31] *Bliss Sequoia Ins. & Risk Advisors, Inc. v. Allied Prop. & Cas. Ins. Co.*, 52 F.4th 417, 420 (9th Cir. 2022).

[32] *United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020); *see, e.g.*, *Bliss Sequoia*, 52 F.4th at 420.

[33] *See, e.g.*, *Winschel v. Brown*, 171 P.3d 142, 149 (Alaska 2007); *see also Johnson v. State*, 224 P.3d 105, 111 (Alaska 2010) (noting defendants are responsible for "natural consequences" of their actions).

defendant's conduct.[34] Proximate cause is effectively a "demand for some direct relation between the injury asserted and the injurious conduct alleged."[35] But we have cautioned that foreseeability is a "broad concept" that "does not require that the precise harm in a given case be predictable."[36]

The court of appeals invoked principles of proximate cause to conclude that the parent of a minor victim was not entitled to restitution for her future lost wages and benefits.[37] The court of appeals' reasoning was based on an assumption that the considerations that factor into the proximate cause analysis in civil cases govern restitution claims in criminal cases.[38] But although civil damages concepts are often informative, the process of determining proximate cause in a criminal case can involve different considerations than those in a civil suit. The logic of civil damages awards, while similar, does not map perfectly onto the law of criminal restitution. For example, although T.R. might have no direct claim for civil damages in a tort suit, as the mother of a minor harmed by a crime, she is defined by statute as a victim entitled to direct restitution.[39]

Below, we first discuss the history of criminal restitution in Alaska, which has included a series of legislative enactments to guarantee that restitution is broadly available to crime victims. This history informs our approach to the proximate cause analysis, which must be conducted in light of the legislature's express policy in favor

---

[34] *See County of Los Angeles v. Mendez*, 581 U.S. 420, 431 (2017) (quoting *Paroline v. United States*, 572 U.S. 434, 444-45 (2014)).

[35] *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

[36] *Winschel*, 171 P.3d at 146 (quoting *P.G. v. State, Dep't of Health & Hum. Servs., Div. of Fam. & Youth Servs.*, 4 P.3d 326, 332 n.11 (Alaska 2000)).

[37] *See Grubb v. State*, 506 P.3d 791, 795-99 (Alaska App. 2022).

[38] *See id.* at 795 & n.10.

[39] AS 12.55.185(19)(B)(ii).

of broad restitution and the statutory designation of a parent as a victim when their minor child has been the victim of crime.  We then explain why our prior decisions regarding the award of civil damages to spouses of tort victims do not control the outcome of this case.  We conclude it was error to hold as a matter of law that Grubb's conduct could not be the proximate cause of T.R.'s damages.

A.      **The Legislature Has Declared That Full Restitution Is To Be Made Available To The Greatest Extent Possible.**

Prior to 1978 Alaska's statutes contained a single reference to restitution: a provision that allowed a judge to require a defendant to pay restitution as a condition of probation.[40]  Restitution under this statute was limited to "actual damages or loss caused by the crime," such as property damage,[41] the value of stolen property,[42] and money wrongfully obtained in the course of committing a crime.[43]

---

[40]      Former AS 12.55.100(a)(2) (1962) ("While on probation and among the conditions of probation, the defendant may be required . . . to make restitution or reparation to aggrieved parties for actual damages or loss caused by the crime for which conviction was had."); *see also* Crim. Code Revision Subcomm'n, Alaska Criminal Code Revision Part VI, at 54 (Tent. Draft 1978) (noting code made "only passing reference" to restitution).

[41]      *See Sprague v. State*, 590 P.2d 410, 415-16 (Alaska 1979) (concluding restitution statute permitted trial court to order defendant to pay "the actual cost of a door broken during the burglary," but precluded ordering defendant to make "punitive payment" to victim).

[42]      *See Hagberg v. State*, 606 P.2d 385, 386-87 (Alaska 1980) (noting, in case where defendant returned some but not all of stolen goods, restitution was appropriate "for the reasonable value of the unreturned portion"); *see also id.* at 387 (Rabinowitz, C.J., dissenting) (stating defendant may not be required to pay restitution if defendant already compensated victim for actual loss).

[43]      *See Gonzales v. State*, 608 P.2d 23, 26 (Alaska 1980) (approving restitution order requiring drug dealer to repay State amount undercover agents spent purchasing cocaine from him).

In the course of its ambitious revision of Alaska's criminal code in 1978, the legislature devoted a significant amount of attention to restitution.[44] The legislature's draft statute included a detailed discussion of which types of losses were eligible for restitution and how restitution may be modified or discharged.[45] But despite detailed drafts, the end result, AS 12.55.045, was relatively modest compared to the sweeping overhaul of restitution proposed in the drafts.[46]

---

[44] *See* Charles R. Pengilly, *Restitution, Retribution, and the Constitution*, 7 ALASKA L. REV. 333, 334 (1990) (noting legislature produced "detailed draft statutes" and "extensive commentary" on restitution); Crim. Code Revision Subcomm'n, *supra* note 40, at 52-56.

[45] Crim. Code Revision Subcomm'n, *supra* note 40, at 52-53. The Criminal Code Revision Subcommission explained that it "felt that restitution should be given more extended treatment" because it is "the one sanction which has the potential for making a victim 'whole,' or nearly so, and because the victim is the most frequently ignored party in the justice system." *Id.* at 54. Although the legislature ultimately did not adopt an extensive restitution statute, more recent legislative efforts have significantly expanded restitution. *See infra* notes 47-59 and accompanying text.

[46] Ch. 166, § 12, SLA 1978. As originally enacted, AS 12.55.045 provided:

> (a) The court may order a defendant convicted of an offense to make restitution as provided in this section or as otherwise authorized by law. In determining the amount and method of payment of restitution, the court shall take into account the financial resources of the defendant and the nature of the burden its payment will impose.
>
> (b) Before the court may sentence a defendant to a program of restitution, the victim must be given notice that restitution may be ordered. An order of restitution under this section does not limit any civil liability of the defendant arising from his conduct.
>
> (c) If a defendant is sentenced to pay restitution, the court may grant permission for the payment to be made within a specified period of time or in specified installments.

*See also Karr v. State*, 686 P.2d 1192, 1197 (Alaska 1984) (discussing purpose of this statute and accompanying legislative commentary).

The legislature made a handful of changes to the law in 1984 that expanded the compensation available to crime victims. Significant to this case, the legislature added a definition of "victim" that included both (1) the direct victim of an offense and (2) the victim's parent, guardian, or other family members if the victim was a minor, deceased, or incapacitated.[47] The legislature also granted crime victims the right to be informed of the procedure to obtain compensation from the Violent Crimes Compensation Board.[48]

In 1988 the legislature amended AS 12.55.045(a) to provide that a defendant who failed to pay restitution would be "presumed to have the ability to pay restitution unless the defendant establishes the inability to pay by a preponderance of the evidence."[49] The legislature also added a requirement that courts consider the "public policy that favors requiring criminals to compensate for damages and injury to their victims" and the "financial burden placed on the victim and those who provide services to the victim as a result of the criminal conduct of the defendant," along with the defendant's financial resources, in calculating restitution awards.[50]

The legislature enacted the comprehensive Crime Victims' Rights Act in 1989, codifying the rights of crime victims not only to be informed of criminal proceedings but also to participate in sentencing and parole decisions.[51] To effectuate these rights, the legislature amended Criminal Rule 32(g)(1)(B), directing the courts to

---

[47] Ch. 154, § 3, SLA 1984; former AS 12.55.185(11) (1984) (providing that " 'victim' means the victim of the offense or, if the victim has died, is a minor, or is incapacitated the term includes a spouse, parent, child, brother, sister or legal guardian of the victim"). The legislature repealed and reenacted AS 12.55.185 in 1989, including the current form of its definition of victim. Ch. 59, § 7, SLA 1989.

[48] Ch. 154, § 4, SLA 1984 (codified at AS 12.61.010(a)).

[49] Ch. 75, § 1, SLA 1988 (codified at AS 12.55.045(a)).

[50] Former AS 12.55.045(a) (1988).

[51] Ch. 59, § 8, SLA 1989 (codified at AS 12.61.010(a)).

take into consideration at sentencing a victim's statement regarding restitution.[52] The Act also amended AS 12.61.015 to require the prosecuting attorney to consult with the victim as to the need for and extent of restitution.[53]

In 1992 the legislature again amended AS 12.55.045, striking the requirement that courts consider the defendant's financial resources; with limited exceptions, the amended statute explicitly forbade courts from considering the defendant's ability to pay restitution.[54] The legislature explained that this change was motivated by its desire to "make full restitution available to all persons who have been injured as a result of criminal behavior, to the greatest extent possible."[55]

Upon a referral from the legislature, Alaska voters enshrined this policy favoring broad restitution into the state constitution in 1994, expanding the goals of the criminal justice system to include "restitution from the offender,"[56] as well as including "the right to restitution from the accused" among the constitutionally guaranteed rights of crime victims.[57]

In 2004 the legislature yet again broadened the availability of restitution, amending AS 12.55.045 to make the award of restitution mandatory: Rather than

---

[52]     Ch. 59, § 27, SLA 1989.

[53]     *See id.* at § 9 (codified at AS 12.61.015(b)(2), (3)).

[54]     Ch. 71, §§ 3, 4, SLA 1992 (codified as amended at AS 12.55.045(a), (f), (g)). The legislature explained that a defendant would be able to present evidence of his ability to pay at a post-conviction hearing after he missed a restitution payment, but not at the time of sentencing. *Id.* § 1.

[55]     Ch. 71, § 1, SLA 1992; *see also Ned v. State*, 119 P.3d 438, 446 (Alaska App. 2005) (quoting *Lonis v. State*, 998 P.2d 441, 447 n.18 (Alaska App. 2000)).

[56]     Alaska Const., art. I, § 12; L.R. 58, 18th Leg., 2d Sess. (Alaska 1994). Statute also defines "the restoration of the victim and the community" among the purposes of criminal sentencing. AS 12.55.005(7).

[57]     Alaska Const., art. I, § 24; L.R. 58, 18th Leg., 2d Sess. (Alaska 1994).

providing that courts "may" order restitution, the new language commanded that courts "shall" order restitution "when presented with credible evidence, unless the victim or other person expressly declines."[58]  The 2004 legislature also amended AS 12.55.045(g) to its current form, providing that "[t]he court may not, in ordering the amount of restitution, consider the defendant's ability to pay restitution."[59]

To summarize, over the last fifty years the legislature has steadily expanded the rights of crime victims to obtain restitution.  Through its efforts, the legislature "has made it plain that it intends Alaska's [restitution] statute to be construed broadly" to fully compensate victims for losses caused by criminal conduct.[60]  Specifically, the legislature has made it abundantly clear that the courts are required to take into account the "public policy that favors requiring criminals to compensate for damages and injury to their victims"[61] and that courts should make "full restitution available to all persons who have been injured as a result of criminal behavior, to the greatest extent possible."[62]

**B.     The Statutory Framework Requires Distinguishing Restitution From Our Civil Tort Caselaw.**

After chronicling the development of Alaska's strong statutory and constitutional language in favor of broad restitution, the State contends that this history shows that "Alaska favors restitution in the strongest terms possible," and that, in the context of restitution awards, tort principles "must be viewed in light of the [crime]

---

[58]     Ch. 17, § 1, SLA 2004 (codified at AS 12.55.045(a)).

[59]     Ch. 17, § 3, SLA 2004 (codified at AS 12.55.045(g)).

[60]     *Maillelle v. State*, 276 P.3d 476, 479 (Alaska App. 2012) (noting "the last time [the Court of Appeals] interpreted the restitution statute narrowly, the legislature promptly responded by amending the statute to overturn our decision").

[61]     Ch. 75, § 1, SLA 1988 (codified at AS 12.55.045(a)).

[62]     Ch. 71, § 1, SLA 1992; *see also*, *Ned v. State*, 119 P.3d 438, 446 (Alaska App. 2005) (quoting *Lonis v. State*, 998 P.2d 441, 447 n.18 (Alaska App. 2000)).

victim's constitutional and statutory rights to restitution."  Grubb, by contrast, argues that although T.R.'s status as a statutory victim gives her a constitutional right to restitution, the constitutional scheme does nothing to guide courts in determining the *amount* of restitution to award.  Grubb argues that a crime victim's right to restitution is necessarily narrower than the right to civil damages,[63] and "can be no greater than the damages available in a civil suit."  We hold that the statutory framework and our case law do not foreclose a finding of proximate cause here.

### 1. The purpose of the restitution statutes and the statutory definition of "victim" affect our analysis of proximate cause.

We have seldom considered questions involving criminal restitution awards,[64] and we have not yet addressed how the statutory and constitutional rights to restitution might factor into the proximate cause analysis or otherwise affect the application of civil tort principles to claims for restitution in criminal cases.  We confront those issues here and conclude that the statutory right to restitution must factor into the proximate cause analysis.  Our conclusion is informed by both the express statutory command to consider the public policy in favor of broad application of the restitution statutes in calculating restitution awards, as well as the statutory recognition of parents as victims when their minor child is a victim of a crime.

---

[63]  Grubb notes several distinctions between civil damages and criminal restitution: the applicable standard of proof, the availability of punitive and noneconomic damages, and the showing required to establish future losses.

[64]  *See Leuch v. State*, 633 P.2d 1006, 1013 n.19 (Alaska 1981) (mentioning "new legislative enactments . . . give a greater role to restitution in the sentencing provisions").  Most of our past decisions have sought to interpret the meaning of "actual damages" in the restitution statute.  *See Sprague v. State*, 590 P.2d 410, 415 (Alaska 1979) (limiting restitution awards to actual damages); *Hagberg v. State*, 606 P.2d 385, 386 (Alaska 1980) (applying *Sprague's* holding that punitive damages are not available in criminal restitution); *Nelson v. State*, 628 P.2d 884, 895 (Alaska 1981) (holding criminal restitution awards are limited to actual damages).

The stated purpose of the restitution statutes is to "make full restitution available . . . to the greatest extent possible."[65] Further, the restitution statute requires courts to consider the public policy favoring victim compensation in calculating the amount and method of restitution payments.[66] We are thus required to afford weight to the legislature's stated policy in our determination as to when and to what extent traditional tort principles should limit the amount of restitution awarded.

Moreover, the restitution statutes confer victim status on persons beyond those "against whom an offense has been perpetrated," including a parent when the parent's child is a victim.[67] The statutory definition of "victim" necessarily affects our proximate cause analysis. In light of the legislature's command to interpret restitution statutes broadly, we interpret AS 12.55.185(19)(B) to permit some individuals who, in the civil context, would not be able to assert an independent claim to seek the same restitution as a traditional "direct" victim of crime. A parent whose child is a crime victim may thus assert a direct claim for restitution for providing care to the child, unlike an adult caregiver seeking civil damages for providing services to a spouse.

An analogy between an award of civil damages and criminal restitution is complicated by the legislature's explicit policy in favor of awarding restitution in criminal cases and the broad definition of "victim" in criminal cases. Although both civil and criminal cases employ a standard of proximate cause, the causation analysis in the criminal restitution context must be undertaken with the legislature's intent in mind. The legislature has declared that criminal restitution should be construed

---

[65]    Ch. 71, § 1, SLA 1992.

[66]    AS 12.55.045(a)(1).

[67]    AS 12.55.185(19)(B)(ii).

- 18 -                                                                                                    **7693**

broadly,[68] that it serves different purposes than civil damages,[69] and — as a consequence of the statutory definition of "victim" — may be available to a more expansive class than in civil litigation. Damages in civil suits are therefore not directly equivalent to damages available for criminal restitution. As the United States Supreme Court has cautioned, "[l]egal fictions developed in the law of torts cannot be imported into criminal restitution and applied to their utmost limits without due consideration" of the different purposes of these remedies.[70]

We have not addressed whether the constitutional right to restitution, as compared to the statutory right, has any effect on the proximate cause analysis. Grubb argues that the legislative history of the constitutional amendments indicates that the legislature intended only to constitutionalize the existing statutory right, not expand the scope of restitution. But we need not determine whether the constitutional amendment expanded the scope of restitution in this case because statute alone provides a sufficient basis for our decision.

### 2. Restitution for parents of minors who are crime victims is not equivalent to civil damages awarded to spouses of tort victims.

Two things distinguish this criminal case from our line of civil cases concluding that tort damages are not available to the familial caregivers of tort victims. Statutory victims of crime, unlike familial caregivers in the civil context, have a direct claim for relief. The parent-child relationship also receives unique statutory recognition, distinguishing it from the spousal relationships at issue in our past civil

---

[68] Ch. 71, § 1, SLA 1992.

[69] *See* Alaska Const. art. I, § 12 (defining purposes of justice system to include protecting the public, restitution, and reformation of offenders); *People v. Bernal*, 101 Cal. App. 4th 155, 123 Cal. Rptr. 2d 622, 627 (2002) (explaining that, beyond compensating victim for losses, restitution also serves rehabilitative and deterrent functions).

[70] *Paroline v. United States*, 572 U.S. 434, 453-54 (2014).

cases. The proximate cause analysis in the context of criminal restitution, although informed by our prior civil negligence cases, must also incorporate these different considerations.

The court of appeals concluded in this case that a parent may not recover lost wages or benefits for taking time off from work to care for a minor child victim, explaining that our precedent "has made clear that determining the extent of such damages is 'too speculative' to be made part of the general recovery of tort victims."[71] The court of appeals has previously upheld awards for past lost wages to victims.[72] But it distinguished Grubb's case, holding that T.R.'s claims for future lost wages and benefits were too attenuated from Grubb's criminal conduct.[73]

The court of appeals instead relied on our decisions regarding the damages available in civil negligence cases — primarily *Heritage v. Pioneer Brokerage & Sales, Inc.* and *Glamann v. Kirk* — to reach its conclusion.[74] While it cautioned that it was not holding "that the recovery available in restitution is entirely coextensive with recovery available in tort," the court of appeals held that "criminal restitution is *limited* by the damages available in a civil case."[75] But this approach fails to appreciate the notable factual and legal differences between those cases and this one.

---

[71] *Grubb v. State*, 506 P.3d 791, 798 (Alaska App. 2022) (quoting *Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059, 1065 (Alaska 1979)).

[72] *See, e.g.*, *W.S. v. State*, 174 P.3d 256, 258-59 (Alaska App. 2008) (upholding restitution for guardian-victim's lost wages); *Yannello v. State*, A- 11001, 2014 WL 1691542, at *4-5 (Alaska App. Apr. 23, 2014) (upholding restitution for injured victim's lost wages).

[73] *Grubb*, 506 P.3d at 796.

[74] *See id.* at 797 (citing *Heritage*, 604 P.2d 1059; and *Glamann v. Kirk*, 29 P.3d 255 (Alaska 2001)).

[75] *Id*. at 795 n.10 (emphasis in original).

In *Heritage v. Pioneer Brokerage & Sales, Inc.*, a civil negligence case, we denied an award of lost wages when a husband took a less lucrative job in order to care for his injured wife.[76] We explained that "a determination of when the support of a close family relationship is necessary to the medical and psychological comfort of the injured individual is always an uncertain inquiry, and the extent of such damages attributable to an injury is, in our view, too speculative to be made part of the general recovery of tort victims."[77]

We reaffirmed *Heritage*'s holding in *Glamann v. Kirk*,[78] where we held that a woman's lost wages for time spent transporting her injured husband to his medical appointments when he could not drive himself were not compensable in a civil negligence lawsuit for her husband's injury.[79] We again concluded that, based on *Heritage*, a determination of when support is necessary in a family relationship is "too speculative" for resulting lost wages to be recoverable.[80]

The court of appeals in this case also cited *Hutchings v. Childress*, a decision by the Ohio Supreme Court.[81] In *Hutchings*, the court rejected a claim for civil damages for income lost by a husband while caring for his injured wife, the plaintiff in the action.[82] It concluded that "[t]he appropriate measure of damages for an uninjured spouse's provision of care to an injured spouse is the economic value of the care

---

[76] 604 P.2d at 1065.

[77] *Id.* at 1065.

[78] 29 P.3d at 265.

[79] *Id.*

[80] *Id.*

[81] 895 N.E.2d 520 (Ohio 2008).

[82] *Id.* at 521.

provided, not the value of the lost wages incurred in providing that care."[83] It indicated that measuring damages by the market value of the care rendered is the majority rule, including in cases addressing care provided to minor children by parents.[84] The *Hutchings* court explained that the choice to cease working to care for a spouse "is caused by a sense of obligation rather than by the accident."[85] In other words, the losses cannot be attributable to the tortfeasor because the spouse's actions were compelled by a sense of obligation or personal affection, not by the tortfeasor's conduct.[86] The Ohio court acknowledged that "[t]he provision of care by a spouse to an injured spouse is to be admired and encouraged," but wondered whether a price could "be placed upon such priceless care."[87]

*Heritage*, *Glamann*, and *Hutchings* were civil tort suits involving spouses who resigned or took lower-paying jobs to care for their injured spouses. This case is different for three reasons: (1) it is a criminal restitution case, guided by a different legislative purpose; (2) T.R. is a statutory victim of a crime, not the spouse of a plaintiff in a civil negligence case; and (3) the parent-child relationship is unlike the spousal relationship.

We discussed in detail above how the legislature's policy in favor of broad restitution for crime victims must factor into the proximate cause analysis. Courts are required by statute to consider this policy in calculating the amount of restitution.[88] The

---

[83] *Id.* at 526; *see also Grubb*, 56 P.3d at 797-98.

[84] *Hutchings*, 895 N.E.2d at 523.

[85] *Id.* at 526.

[86] *See id.*

[87] *Id.* at 522.

[88] AS 12.55.045(a).

legislature has not adopted a similar directive encouraging courts to consider the public policy favoring compensation when calculating damages in tort.

T.R.'s status as a statutory crime victim also distinguishes this case from *Heritage*, *Glamann*, and *Hutchings*. In the civil context, we have justified barring recovery by familial caretakers based on two concerns: (1) the risk of "double recovery," when the plaintiff recovers the cost of medical care and the injured family member recovers the cost of caregiving, effectively paying for the plaintiff's care twice, and (2) the "speculative" nature of calculating damages based on the difference between actual and potential earnings.[89]

When a minor child is the victim of a crime, the parent is also defined by statute as a victim of the crime.[90] This statutory victim status has no analog in civil law and effectively addresses both of the concerns that led us to deny recovery in *Heritage* and *Glamann*. As a statutory victim, a parent has a direct claim for relief. And while the difference between a spouse's actual and potential earnings was deemed too speculative in the civil context, the criminal statute provides that a victim's lost income is a permissible basis for a restitution award.[91]

Finally, *Heritage*, *Glamann*, and *Hutchings* differ because of the unique nature of the parent-child relationship. We explained in *Heritage* and *Glamann* that a spouse may be inclined to provide support based on affection,[92] and the court of appeals concluded that T.R.'s losses also "hinge[d] on a sense of personal obligation that is

---

[89] *Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059, 1064-65 (Alaska 1979) (citing *Rodriguez v. Bethlehem Steel Corp.*, 525 P.2d 669, 687 (Cal. 1974)).

[90] AS 12.55.185(19)(B)(ii).

[91] AS 12.55.045(d).

[92] *See Heritage*, 604 P.2d at 1065; *Glamann v. Kirk*, 29 P.3d 255, 264-65.

difficult to quantify."[93]  But the parent-child relationship is not the functional equivalent of the relationship between spouses for purposes of the restitution statutes.

Most notably, our criminal statutes recognize that the parent of a minor child is the victim of an offense perpetrated against a minor child.[94]  In the typical criminal case, however, one spouse is not the victim of an offense perpetrated against the other.[95]  This distinction reflects the fact that parents have a legal duty to support and protect their children, regardless of any feelings of affection or personal obligation.[96]  Children cannot independently arrange for their own care, transportation, or services; instead, they are dependent on their parent or guardian to do so.[97]  Indeed, a parent or guardian is often the only person who can practically coordinate the care that an injured child needs.  Our statutes reflect this reality by allowing the parents of child victims to assert direct claims for restitution.

While *Heritage* and *Glamann* may provide a helpful comparative guide for determining restitution awards, particularly in the area of proximate cause, these cases do not circumscribe the scope of restitution that is available in a criminal case. Criminal restitution considers factors that are absent from the civil context, such as the express policy in favor of broad restitution and the statutory victim status of certain

---

[93]     *See Grubb v. State*, 506 P.3d 791, 796-97 (Alaska App. 2022).

[94]     AS 12.55.185(19)(B)(ii).

[95]     AS 12.55.185(19) (recognizing spouse as victim only where person against whom offense is perpetrated is minor, incompetent, incapacitated, or deceased).

[96]     *See, e.g.*, *Michael W. v. Brown*, 433 P.3d 1105, 1109 (Alaska 2018) ("The duty to support and protect children generally falls on their parents."); *Benson v. Benson*, 977 P.2d 88, 92 (Alaska 1999) ("Regardless of whether a support order exists, a parent is obligated both by statute and at common law to support his or her children." (citations and quotation omitted)).

[97]     *Cf. Parham v. J.R.*, 442 U.S. 584, 603 (1979) (observing, in civil commitment context, that most children "simply are not able to make sound judgments concerning many decisions, including their need for medical care and treatment").

family members.  It was error to rely on *Heritage* and *Glamann* without considering how a criminal case involving a parent-child relationship differs from these civil cases involving spousal relationships.

The court of appeals relied on *Ned v. State* for the proposition that "a person injured by a defendant's criminal conduct may not recover more than the person could recover in a civil case based on the same conduct."[98]  In *Ned* the court of appeals recognized that the purpose of the restitution statutes is "[to] make full restitution available to all persons who have been injured as a result of criminal behavior, to the greatest extent possible."[99]  But it followed this recognition with a conclusion: "Nevertheless, we do not think that the legislature intended for restitution in criminal cases to exceed the restitution that could be awarded in related civil cases."[100]

The court of appeals' observation in *Ned* — a single sentence unaccompanied by any discussion of legislative history — does not control the outcome of this case.  The amount recoverable in a civil case is often a reliable upper bound for the amount available in criminal restitution; as the court of appeals correctly notes, restitution is limited to "actual loss or damages," meaning that the amount recoverable as restitution will often be lower than that available in a civil suit in which punitive damages are available.[101]  But there is no uniform rule that restitution may never exceed what is available in the closest analogous circumstances under civil tort law.

---

[98]     *Grubb*, 506 P.3d at 795.

[99]     *Ned v. State*, 119 P.3d 438, 446 (Alaska App. 2005) (citing *Lonis v. State*, 998 P.2d 441, 447 n.18 (Alaska App. 2000)).

[100]     *Id*.

[101]     *Grubb*, 506 P.3d at 795 n.10.  The court of appeals also noted here that the legislature has declared that a restitution order is a civil judgment.  *Id* at 795.  But as the court of appeals previously explained, this was a "procedural change in the enforcement mechanism for the judgment," and does not otherwise affect the purposes or features of criminal restitution.  *Lapp v. State*, 220 P.3d 534, 540 (Alaska App. 2009).

Restitution for crime victims incorporates certain principles and statutes that have no equivalent in civil tort law. Directly analogizing to civil tort cases without acknowledging the unique considerations in criminal restitution proceedings fails to account for these differences between civil and criminal law.

## C. It Was Error To Determine As A Matter Of Law That Grubb's Conduct Could Not Be The Proximate Cause Of T.R.'s Losses.

In light of the distinct purposes of criminal restitution and the factual differences between this case and the case law relied on by the court of appeals, we cannot agree with the court of appeals' conclusion that, as a matter of law, Grubb's conduct was not the proximate cause of T.R.'s future losses.[102] The court of appeals stated that "it is not reasonably foreseeable that a defendant would have to bear the costs of diminished pay for a caretaker," particularly in cases "when the loss of income is extreme as in the case of a particularly high-paying job."[103]

Restitution is proximately related to a defendant's crime if the claimed losses are reasonably foreseeable consequences of the defendant's criminal conduct.[104] In other words, the losses must be "natural consequences" that are "reasonably

---

[102] Proximate cause is "normally a question of fact," and becomes a question of law "only where reasonable minds could not differ." *See P.G. v. State, Dep't of Health & Hum. Servs., Div. of Fam. & Youth Servs.*, 4 P.3d 326, 334 (Alaska 2000) (quoting *Dura Corp. v. Harned*, 703 P.2d 396, 406 (Alaska 1985)). The court of appeals erred in concluding that, as a matter of law, Grubb's conduct could not be the proximate cause of T.R.'s future lost income.

[103] *Grubb*, 506 P.3d at 799.

[104] *Peterson v. Municipality of Anchorage*, 500 P.3d 314, 322 n.36 (Alaska App. 2021) ("[B]ecause restitution is triggered by a conviction, the harm for which a defendant pays restitution must be a directly foreseeable result of the criminal act that leads to a conviction." (alteration in original) (quoting *State v. Baker*, 177 A.3d 1093, 1100 (Vt. 2017))); *see also Seeley v. State*, A-13394, 2023 WL 2783265, at *4 (Alaska App. Apr. 5, 2023) (directing trial court to apply "reasonably foreseeable" test to restitution award on remand).

foreseeable in light of ordinary experience."[105] As we have explained, "foreseeability is a broad concept and does not require that the precise harm in a given case be predictable."[106] In the past, we have phrased this concept as asking whether the force set in motion by the defendant had "exhausted itself,"[107] or whether a reasonable person would assign responsibility for the victim's injury to the defendant.[108]

It is foreseeable that a parent would forgo opportunities, including employment opportunities, to care for an injured child victim. Parents owe a duty to care for their children, which the legislature has recognized by designating the parent as a victim when their minor child is the victim of a crime.[109] As statutory victims, parents have a direct claim to restitution, and — as the court of appeals has previously held in other contexts — it is reasonably foreseeable that a victim may incur damages in the form of lost wages.[110] In particular, it is foreseeable that a child victim of sexual

---

[105] *Johnson v. State*, 224 P.3d 105, 111 (Alaska 2010).

[106] *Winschel v. Brown*, 171 P.3d 142, 146 (Alaska 2007) (quoting *P.G. v. State, Dep't of Health & Hum. Servs., Div. of Fam. & Youth Servs.*, 4 P.3d 326, 332 n.11 (Alaska 2000)).

[107] *Howarth v. State, Pub. Def. Agency*, 925 P.2d 1330, 1333 (Alaska 1996) (quoting *Vincent by Staton v. Fairbanks Mem'l Hosp.*, 862 P.2d 847, 851 n.8 (Alaska 1993)).

[108] *See Gonzales v. Krueger*, 799 P.2d 1318, 1320-21 (Alaska 1990). For example, we previously concluded that a parole officer might be held responsible when a parolee under the officer's supervision injures a plaintiff in the community the parolee was released into. *State, Dept. of Corr. v. Cowles*, 151 P.3d 353, 363-64 (Alaska 2006) (discussing *C.J. v. State*, 151 P.3d 373 (Alaska 2006)).

[109] AS 12.55.185(19)(B)(ii).

[110] *W.S. v. State*, 174 P.3d 256, 258-59 (Alaska App. 2008); *see also Lawrence v. State*, 764 P.2d 318, 322 (Alaska App. 1988) (permitting award of restitution for "anticipated future [counseling] expenses," so long as those expenses are "firmly established").

abuse will need substantial care, especially when, as here, there are aggravating factors, including the age of the victim and the severity of the assault, that heighten the harm.

During oral argument Grubb asserted that T.R.'s need to resign "accrued from her son" and his additional healthcare needs, rather than Grubb's conduct. Stated differently, Grubb argues that T.R.'s resignation was not proximately caused by the abuse, but was caused by M.M.'s need for additional care. The court of appeals likewise suggested that, while T.R.'s decision was "understandable," it "involved too many indeterminate variables" that were "unconnected to Grubb's conduct."[111] But T.R. is a victim herself; her claim to restitution is not derived from her son's. And in this context, there is a unity of interest between T.R. and M.M. T.R. had a direct claim based on the harm that M.M. experienced. Although the theory of liability in this case relies on an extended chain of causation, we cannot say as a matter of law that Grubb's criminal behavior was not a proximate cause T.R.'s loss of future wages and benefits.

### 1. Cost of caregiving is not a uniformly appropriate substitute for lost wages.

The court of appeals suggested that the proper measurement of restitution for a parent's time spent caring for a minor child victim should be the fair market value of the caregiving services provided.[112] Grubb, echoing the principles that have led courts to limit recovery in the civil tort context,[113] contends that measuring restitution for caregiving based on a parent's lost wages could be inequitable based on the parent's occupational status — that is, how much the parent makes and whether they are able to

---

[111]  *Grubb v. State*, 506 P.3d 791, 798 (Alaska App. 2022).

[112]  *Id.* at 797-98.

[113]  *See, e.g.*, *Hutchings v. Childress*, 895 N.E.2d 520, 526 (Ohio 2008) ("Is the care that a stockbroker provides an injured spouse more valuable than the care provided by a spouse making the minimum wage? No.").

take time off from work.  For the reasons detailed below, we disagree that this apparent inequity requires us to reject lost wages as a measure for the amount of damages.

The yardstick for restitution is the "actual damages" caused by the defendant's crime.[114]  Restitution is not intended to offer a set amount to every victim or to be a predictable cost to the offender; instead, the actual damages of an offense will turn on the circumstances of the victim, including the victim's health, career, family connections, socioeconomic status, lifestyle, and so on.[115]  These particulars may never be entirely foreseeable, but the requirement of proximate cause is satisfied so long as the "general kind of harm" is foreseeable.[116]  The court of appeals has accordingly approved restitution to compensate for a variety of claimed losses, including restitution for such things as expenses related to a memorial service,[117] a one-year anniversary celebration of life,[118] moving a household following the sexual abuse of a minor

---

[114]    *See* AS 12.55.045(n); AS 12.55.100(a)(2)(B); *see also Sprague v. State*, 590 P.2d 410, 415 (Alaska 1979) (holding punitive damages are not available in criminal restitution).

[115]    This could, in certain circumstances, lead to a higher restitution award for an individual who cannot continue working in a higher-paying job as a result of a crime. While courts have rejected this outcome in the civil context, *see, e.g. Hutchings*, 895 N.E. at 526 ("The care a spouse provides is not more valuable to an injured plaintiff because of the nature of the job held by the person providing the care."), the statutory use of the term "actual damages" requires restitution awards to reflect the damages suffered, not the value of the care provided.

[116]    *Winschel v. Brown*, 171 P.3d 142, 149 (Alaska 2007).

[117]    *Ned v. State*, 119 P.3d 438, 445-46 (Alaska App. 2005).  The appellant in *Ned* conceded on appeal that he could be required to pay restitution for the travel expenses of statutory victims. *Id.* at 45-46.

[118]    *Almeda v. State*, No. A-12599, 2020 WL 7238377, at *2 (Alaska App. Dec. 9, 2020).

victim,[119] an assault victim's parents' travel to Alaska from Germany,[120] and, in *W.S. v. State*, time a child's guardian spent away from work to care for a minor victim.[121] Notably, this approach to restitution appears broader than that of many other jurisdictions: Several of the cases Grubb cites directly conflict with the court of appeals' decision in *W.S.*

The court of appeals explained that "T.R.'s projected wage and benefit losses hinged on a number of factors unconnected to Grubb's conduct—for example, the flexibility of her job, her supervisor's diminished willingness to accommodate her scheduling needs, and her decision to resign rather than take a leave of absence."[122] But it did not explain how this situation involves greater uncertainty than in any award of restitution to a crime victim. For example, in *Yannello* the court of appeals permitted restitution for lost wages based on an estimate of the victim's earning capacity and airfare for the victim's parents to get to Alaska from Germany.[123] In that case, as in every case, the restitution award hinged on a variety of factors unique to the victim's circumstances. As we have explained before, "[t]he defendant must take the victim as the defendant finds the victim."[124]

---

[119]     *Reece v. State*, 881 P.2d 1135, 1138 (Alaska App. 1994).

[120]     *Yannello v. State*, No. A-11001, 2014 WL 1691542, at *1, *3 (Alaska App. Apr. 23, 2014).

[121]     *W.S. v. State*, 174 P.3d 256, 258-59 (Alaska App. 2008).

[122]     *Grubb v. State*, 506 P.3d 791, 798 (Alaska App. 2022).

[123]     *See generally Yannello v. State*, A-11001, 2014 WL 1691542 (Alaska App. Apr. 23, 2014).

[124]     *Brandner v. Hudson*, 171 P.3d 83, 88 (Alaska 2007) (quoting *Glamann v. Kirk*, 29 P.3d 255, 261 (Alaska 2001)) (recognizing "eggshell plaintiff" rule requires liability for "unusual or unpredictable" injuries that "were either caused or aggravated by" defendant's conduct).

Similar considerations would have to be taken into account for any award of caregiving costs, undercutting the suggestion that this metric offers a more uniform rule. A parent caring for an injured child performs many roles simultaneously — nurse, therapist, babysitter, teacher, and more — and does so around the clock. Attempting to quantify the fair market value of the services provided by such a caregiver, and determining when compensable caregiving stops and unpaid parenting begins, are thorny questions. Attempting to answer these questions would inevitably require reference to factors unconnected to the defendant's conduct, making this method of calculating compensation no more foreseeable in its results than quantifying the parent's lost wages. The eventual answer would be no more precise than the lost wages calculation, and might be less or (more likely) more than the actual lost wages of the parent. This result departs from the statutory mandate that restitution be measured by the statutory victim's actual losses,[125] and further counsels against adopting the court of appeals' proposed measurement.

Allowing statutory victims to claim lost wages for time spent caregiving does not preclude other families from seeking restitution for the cost of caregiving services if their actual damages include such services. Restitution awards must reflect the unique losses that victims suffer; if a family hired a caregiver or otherwise incurred caregiving costs, those costs may be the proper basis for a restitution award. But we will not adopt a uniform rule that rejects consideration of the unique life circumstances of victims. For this reason, we do not adopt a uniform rule that measures the value of the time spent caregiving by the market value of the caregiving services.

---

[125] *See* AS 12.55.045(n); AS 12.55.100(a)(2)(B); *Peterson v. Municipality of Anchorage*, 500 P.3d 314, 318 (Alaska App. 2021) ("Alaska's restitution statutes provide that, unless a victim declines restitution, a court shall order restitution for the actual damages or loss caused by the conduct for which the defendant was convicted.").

### 2. T.R.'s damages were reasonably quantifiable.

The court of appeals asserted that T.R.'s "testimony during the hearing suggests that . . . she encountered difficulties in estimating her projected future earnings."[126] The court of appeals provided no basis for this assertion. By contrast, the trial court found that "[T.R.]'s testimony and calculations were credible, accurate, and thorough," and it is "the superior court, not this court, [that] judges the credibility of witnesses."[127]

When considering whether to award restitution in a criminal case, trial courts must often consider witness credibility in determining whether the loss has been firmly established under the particular facts and circumstances of the case.[128] Factual determinations, including judging the credibility of witnesses, is left to the fact finder, and appellate courts must give trial courts' "factual determinations 'particular deference' when they are based on oral testimony."[129] Beyond the foreseeability of the harm, the damages themselves must be both reasonable and "firmly established."[130]

The evidence supports the trial court's findings. Consistent with the court's observations, T.R. was well-prepared and had thoroughly researched her losses,

---

[126] *Grubb v. State*, 506 P.3d 791, 799 (Alaska App. 2022).

[127] *Laybourn v. City of Wasilla*, 362 P.3d 447, 452 (Alaska 2015).

[128] We recognize the difficulty caused by a test that turns on case-specific facts and circumstances. As the California Supreme Court put it, "there are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for that injury." *Thing v. La Chusa*, 771 P.2d 814, 830 (Cal. 1989).

[129] *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 396 (Alaska 2017) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)).

[130] *Lawrence v. State*, 764 P.2d 318, 322 (Alaska App. 1988); *see also Peratrovich v. State*, 903 P.2d 1071, 1078 (Alaska App. 1995) (explaining that "a restitution order must be based on substantial evidence of monetary loss or expense, not mere speculation").

including by consulting with State retirement and benefits technicians. Likewise, T.R. explained the damages in detail at the hearing and in a supplemental memo. Whether the damages arising from T.R.'s resignation are reasonable must be determined in the context of the case and on the credibility of the witnesses, which requires particular deference to the trial court's assessment of the witnesses.

## V.   CONCLUSION

We REVERSE the court of appeals' decision and REMAND to the court of appeals for further proceedings on Grubb's remaining challenges to the restitution award, including his excessive-fines and duty-to-mitigate arguments.